UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **PLAINTIFFREY DESCHENES,**<br><br>*Plaintiff,*<br><br>vs.<br><br>**THE MASSACHUSETTS DEPARTMENT OF CHILDREN AND FAMILIES, by and through its commissioner Linda S. Spears, ,**<br><br>*Defendants.* | **CIVIL ACTION NO:**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

## COMPLAINT AND JURY DEMAND

This action is commenced by PLAINTIFFREY DESCHENES (hereinafter "Plaintiff") against THE MASSACHUSETTS DEPARTMENT OF CHILDREN AND FAMILIES (hereinafter "Defendant" or "DCF") to remedy and seek relief for unlawful employment practices.

## JURISDICTION AND VENUE

1. This present action arises under federal laws The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a) and § 623(d) (ADEA).

2. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims in that they form part of the same case or controversy. Judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

4. Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendants' place of business, the relevant records, and the alleged unlawful practices occurred and/or continue to occur within the Commonwealth of Massachusetts in the judicial district of this Court.

## PARTIES

5. Plaintiff presently resides in the city of Somerset, county of Bristol, within the Commonwealth of Massachusetts.

6. Plaintiff presently works for Defendant, the Massachusetts Department of Children and Families.

7. Defendant, the Massachusetts Department of Children and Families, (hereinafter "DCF"), being sued by and through its commissioner Linda S. Spears, with its principal place of business located, upon information and belief, at 600 Washington Street, Boston, MA, 02111, county of Suffolk, Commonwealth of Massachusetts.

## ADMINISTRATIVE PROCEDURES

8. Charges of Discrimination were timely filed with the Massachusetts Commission Against Discrimination (hereinafter the "MCAD") and co-filed with the Equal Employment Opportunity Commission (hereinafter "EEOC") on or about August 17, 2017 (MCAD: 17BEM02327 and EEOC: 16C-2017-02228).

9. On or about December 20, 2017, Plaintiff filed for withdrawal from the MCAD and EEOC.

10. The MCAD issued its Dismissal allowing for civil suit on or about December 21, 2017 and the EEOC subsequently also released the case enabling this private action to be filed in a civil court.

11. This Complaint was timely filed after issuance of the MCAD and EEOC Dismissals.

## FACTUAL ALLEGATIONS

12. In or about April 2001, Plaintiff Jeffrey Deschenes (hereinafter "Plaintiff") began working for the Department of Children and Families (hereinafter "DCF" or "employer") in Fall River, MA, as a Social Worker.

13. At all times relevant since Plaintiff's hiring, Plaintiff's performance met or exceeded his employer's legitimate expectations.

14. Approximately five years ago Plaintiff was promoted to a supervisor.

15. Plaintiff is a member of protected class under state and federal law because Plaintiff is 52 so he is a person over forty.

16. Plaintiff is also a protected class under state law because Plaintiff a gay male.

17. In or about late 2015, Plaintiff found out that Ms. Nancy Kinder (hereinafter "Ms. Kinder"), Plaintiff's supervisor, learned about Plaintiff sexual orientation.

18. Ms. Kinder had asked a coworker of Plaintiff if Plaintiff was gay without his knowledge.

19. It is policy to not discuss sexual orientation.

20. As such, Ms. Kinder violated this policy.

21. After learning from his coworker that Ms. Kinder had inquired as to Plaintiff's sexual orientation, which he was not open about at that time, Plaintiff approached Ms. Kinder.

22. Plaintiff asked Ms. Kinder why she had asked his coworker about his sexual orientation.

23. Ms. Kinder responded that she was "curious."

24. Plaintiff was distressed by this act by Ms. Kinder and the discussion of his sexual orientation with his supervisor at work.

25. After finding out Plaintiff was gay, things changed with how Plaintiff was treated by his supervisor, Ms. Kinder, and others including Area Manager Ms. Elaine Lucas (hereinafter "Ms. Lucas").

26. Then in or about early 2016, Ms. Kinder told Plaintiff that he was going to be reassigned to a different supervisor.
27. However, at the time, the Ms. Lucas said that the transfer was only for about six months beginning in or about May of 2016.
28. Ms. Lucas, assured Plaintiff that in six (6) months, which would be in or about December of 2016, that Plaintiff would be transferred back to his old role.
29. In or around this time, Plaintiff also noticed that the age make-up of supervisors had changed; older (over 40) supervisors, which used to be the predominate age group in the supervisor position, had reduced and under 40 supervisors were being hired at a rate significantly above those over 40.
30. Of note, today, the makeup of the supervisor position in Plaintiff's office is mostly under 40 as older workers were replaced with younger workers.
31. When December of 2016 arrived, Plaintiff was not transferred back to his old position as promised.
32. In or around December or January of 2017, Plaintiff's performance review indicated that he only met expectations rather than exceeding them which was the more accurate representation of Plaintiff's prior and ongoing performance, as Plaintiff went above and beyond for his job which was known to Plaintiff's supervisor and higher leadership such as Ms. Lucas.
33. Plaintiff received "meets expectations" in all areas of his evaluation despite the fact that Plaintiff did extra work with DCF interns and worked as a liaison to South Bay; thus as was standard pattern and practice for such performance, Plaintiff expected his evaluation to reflect that he exceeded expectations.
34. Plaintiff brought this concern to Ms. Lucas as well as his concerns that he had not been transferred back to his old role still, as of January of 2017.
35. In the past, Plaintiff had one instance where the same performance review situation occurred where Plaintiff was evaluated as meeting expectations rather than exceeding and Plaintiff challenged it.

36. In this past instance, prior to Plaintiff aging further and prior to Ms. Lucas' and Plaintiff's supervisor Ms. Kinder's and Ms. Lucas' knowledge of Plaintiff's sexual orientation, Ms. Lucas advocated for Plaintiff and his evaluation was changed in his favor.
37. In the more recent instance of a concerning performance review, the January of 2017 evaluation was not changed.
38. Plaintiff's request was coldly and flatly denied.
39. As such, therefore Plaintiff refused to sign the evaluation.
40. Additionally, Plaintiff wrote a letter reporting his concerns because Plaintiff did not believe the evaluation was done fairly nor fairly reflected his performance.
41. Upon information and belief, there was no investigation into reports of unfairness and no swift remedial action was taken.
42. Then by February of 2017, Plaintiff had still not been transferred to his old role.
43. At this time, Plaintiff asked Ms. Lucas if he was still going back to his old role.
44. Plaintiff did not understand why he had not already been returned to his old role despite promises by Ms. Lucas that such a transfer was going to happen.
45. Ms. Lucas reluctantly met with Plaintiff and denied the move to his old role.
46. Specifically, Ms. Lucas stated, untruthfully, that she never promised Plaintiff would go back to his prior role.
47. Ms. Lucas condescendingly told Plaintiff that he was "being sensitive" when Plaintiff brought his concerns to her attention.
48. Plaintiff was not accused of being "too sensitive" prior to knowledge of him being gay becoming known to his supervisors.
49. Being "too sensitive" is a stereotype of gay males.
50. Plaintiff took the comment to be a criticism or harassment of him because he was gay.

51. Ms. Lucas stated she would not reconsider Plaintiff's placement and Plaintiff got up to return to work.
52. In response to Plaintiff simply rising from the chair, Ms. Lucas yelled at Plaintiff in a demanding and condescending way, "[s]it down right now I haven't dismissed you."
53. Ms. Lucas had not yelled at Plaintiff before or spoken to him like this before learning of his sexual orientation.
54. Plaintiff told Ms. Lucas he intended to transfer to another office.
55. Ms. Lucas responded, in a badgering way, "[r]un Jeffrey, run away."
56. In or around March 2017, there was an inquiry into a situation which involved Nicole Campbell (hereinafter "Ms. Campbell"), one of Plaintiff's subordinates.
57. Ms. Campbell had a history of perpetuating discrimination against Plaintiff.
58. Plaintiff was unaware that Ms. Campbell had cancelled a home visit with a client on the Monday after a client had cancelled the previous Friday, and as a result there was an injured child that the team did not become aware of.
59. Ms. Campbell and a handful of Plaintiff's other newer subordinates who had been targeting Plaintiff seemingly because of his age and sexual orientation, discriminated against and harassed Plaintiff because of his age and sexual orientation.
60. Despite the event being one that Plaintiff did not know about and therefore could not have remedied the serious mistake of his subordinate, Ms. Lucas wrongfully attempted to make Plaintiff take all of the blame.
61. Ms. Lucas stated that Plaintiff should take responsibility because he did not tell Ms. Campbell to do an unannounced visit on the day that the client canceled.
62. Plaintiff had a meeting with Ms. Lucas, his supervisor Derrick Rezendes, Ms. Campbell, and Ms. Rego about the incident that Ms. Campbell solely caused and was responsible for solely.

63. Ms. Lucas stated there would be no consequences for Ms. Campbell and allowed Ms. Campbell to leave while Ms. Lucas condescended to and lectured Plaintiff about certain forms that Plaintiff was very familiar with given his over 16 years of tenure.

64. Ms. Lucas knew this act was condescending but mocked Plaintiff anyway.

65. This harassment was embarrassing and degrading as Plaintiff had worked with these forms for over 16 years and as such, distressed Plaintiff.

66. Not long after, in or around May 2017, Plaintiff stated to his leadership team that he wanted to put in for the adoption supervisor position because Plaintiff wanted to change to adoption.

67. This adoption position had been offered to Plaintiff about a year and a half prior, but before Plaintiff had aged further and leadership found out he was gay.

68. The position was later given to a younger, under 40, non-gay person *with less qualifications and seniority.*

69. Plaintiff felt unfairly deprived of this position without explanation given the other, younger and not gay employee got the job despite Plaintiff's qualifications, seniority, and having been offered this position in the past.

70. Then, on or around May 31, 2017, the subgroup of newer subordinates who were perpetuating the targeting, discrimination, and harassment of Plaintiff due to his age and sexual orientation, made false, negative reports to Ms. Lucas about Plaintiff's management style.

71. Plaintiff explained to Ms. Lucas that the concerns were totally untrue and that he could prove it, which Plaintiff could.

72. However, the management team showed no interest and did not listen to Plaintiff's side of the story.

73. In response and fearful of unjust discipline for Plaintiff, one present and two past subordinates, some of which were by then supervisors, wrote letters supporting Plaintiff and clearly indicating

that the negative allegations by this subgroup of subordinates, as to Plaintiff's management style, were totally untrue.

74. Ms. Lucas indicated that there would be an inquiry into the subordinate's untrue allegations.

75. Plaintiff felt that the inquiry was not a sufficient investigation.

76. Management would not consider the letters I had supporting me from long-time subordinates and simply took the word of the group of employees that were harassing and discriminating against me.

77. From that point forward, the targeting, harassment, and discrimination by Ms. Lucas, Plaintiff's subordinates, and others increased.

78. In June of 2017 there were several additional incidents where Plaintiff was targeted for poor treatment.

79. Plaintiff began the practice of reporting these harassing or discriminatory events to Ms. Lucas.

80. When Plaintiff made such reports, Ms. Lucas response was that that Plaintiff was "being sensitive."

81. Again, Plaintiff had never been called "sensitive" before his leadership found out he was gay.

82. During this time, the allegations by Plaintiff's subset of discriminating subordinates were not properly investigated by leadership and the letters supporting him were disregarded and instead, a one-sided targeting of him with no evidence to support the subordinate's harassing and untrue reports about Plaintiff's management style continued.

83. Also during this entire timeframe since Plaintiff was initially targeted because of his sexual orientation, the makeup of supervisors in Plaintiff's location continued to become younger with a larger and larger portions of supervisors under 40.

84. Then in or around June 2017, Plaintiff asked Ms. Lucas to allow him to move units.

85. Ms. Lucas harshly stated she was not going to move "the problem" to another unit.

86. Plaintiff took this comment to mean that "the problem" was him.

87. Plaintiff had a long history of very good reviews with the exception of the one he had challenged that was changed before it was known he was gay, and the less favorable reviews that occurred once the targeting of Plaintiff started.

88. As such, Plaintiff did not know why Ms. Lucas called him a "problem."

89. On or around June 27, 2017 the meeting was scheduled to review the inquiry into Plaintiff's subordinate's untrue and harassing allegations.

90. Ms. Lucas found against Plaintiff without evidence and decided that Plaintiff's conduct was improper and Plaintiff was informed that such conduct would not be tolerated.

91. Again, the alleged conduct were false accusations by a group of discriminating subordinates despite Plaintiff's written support of *several* former subordinates.

92. As a result, Plaintiff was wrongfully written up for the first time in his over 16 years at DCF at 52 years old.

93. As penalty for Plaintiff's unfounded offense, Plaintiff was informed that if another report about his conduct was made, that Plaintiff would be terminated from his employment with DCF.

94. Plaintiff grieved the decision and continued to report the ongoing harassment and discrimination, this time to the diversity office.

95. In or about mid-July of 2017, without proper investigation of Plaintiff's reports of discrimination, the diversity office produced a report.

96. That report both misstated Plaintiff's allegation but also found, without evidence, and with making the finding of fact *in only one line*, that no violation of Plaintiff's rights had occurred.

97. In July of 2017, Plaintiff was under so much stress at work due to the constant harassment and discrimination at work that his doctor put him out of work out of concern for his health.

98. From this point forward, Plaintiff had to continually seek medical treatment for work-related emotional distress.

99. Plaintiff was prescribed medication to address the distress work had been caused.

100. Plaintiff also treated with medical professionals to discuss and try to cope with the distress caused by the continual emotional distress caused by work.

101. Plaintiff returned after a couple weeks later to find his June 2017 evaluation was done unfairly.

102. Specifically, Plaintiff was first given the A portion and upon information and belief should have been given the C portion first, so this was in reverse order and different from similarly situated supervisors.

103. Further, both portions were just left in Plaintiff's office and Plaintiff was emailed stating that his supervisor would go over the evaluations with him.

104. It is not only protocol but pattern and practice for a supervisor's supervisor to go over evaluations in person with the reviewed employee.

105. All other supervisors had their evaluations reviewed in person with their supervisors.

106. Plaintiff's supervisor never went over his evaluations with Plaintiff.

107. Moreover, leadership attached a separate section to Plaintiff's evaluation with a list of additional areas of need and/or tasks.

108. No other manager that Plaintiff is aware of got that extra list attached to their evaluation.

109. Plaintiff had never in his years as supervisor gotten that extra list attached to his evaluation.

110. Further, Plaintiff's evaluation rated him below expectation in one area and an overall rating of only "met" when again, Plaintiff had always been an exemplary supervisor and employee.

111. Plaintiff was shocked and raised this concern about his performance evaluation to leadership but to no avail.

112. Plaintiff informed leadership that he believed his evaluation was unfair and Plaintiff did not understand why there was an additional list attached when no other supervisor had such a list.

113. As such, Plaintiff refused to sign either evaluation.

114. Additionally, Plaintiff yet again reported the harassment, targeting, and discrimination because of his age and sexual orientation by attaching a statement reporting the same to his unsigned evaluations.

115. Plaintiff continued working in his job but was continually distressed by the ongoing, reported yet un-remedied harassment and discrimination because of his age, sexual orientation, and in retaliation for his reports of the same to leadership and the diversity office.

116. Upon information and belief, there was never a proper investigation into the *many* complaints about harassment and discrimination because of Plaintiff's age and sexual orientation.

117. Plaintiff believes that he is being set up for termination because of his age and sexual orientation.

118. If Plaintiff is terminated he will be deprived of significant pension benefits that he would attain if he was allowed to just transfer to a non-harassing and discriminating work environment and work in the job he loves through retirement.

119. Additionally, despite and following filing charges of discrimination with the commission, Plaintiff has experienced continued harassment, discrimination, and retaliation.

120. Specifically, in or about September of 2017, after Plaintiff had filed charges of discrimination, he was denied a requested transfer to the New Bedford office.

121. Again, the person placed in the position had less seniority and is believed to be under 40 and not gay.

122. Plaintiff received consistent treatment from medical professionals and is still under the care of medical professionals to cope with and treat the symptoms of severe emotional distress as a result of the continued harassment, discrimination, and retaliation.

123. Plaintiff continues to work in a hostile work environment and is refused every transfer request despite Plaintiff's experience and seniority.

124. As a direct and proximate result of Plaintiff's employer's harassing, discriminatory actions and omissions, Plaintiff suffered loss of income and earning capacity; suffered humiliation, loss of standing in the community; suffered loss of enjoyment of life, suffered and continues to suffer from extreme emotional distress and mental anguish resulting in physical injury; and suffered other injuries. All damages continue to date.

**COUNT ONE**
*AGE DISCRIMINATION - HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
*AGE DISCRIMINIATION - FAILURE TO TRANSFER/PROMOTE*
*AGE DISCRIMINATION – RETALIATION*
**Violation of The Age Discrimination in Employment Act of 1967 29 U.S.C. § 623(a) and 623(d)**
*(ADEA)*

125. ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

126. Plaintiff was protected from age-based harassment and discrimination under the ADEA.

127. Because of his age, Defendant and its agents treated Plaintiff differently than employees under 40, subjected him to disparate discriminatory treatment and harassment because of his age.

128. Such treatment and harassment was so severe and pervasive it changed the terms and conditions of employment as described in the above Paragraphs.

129. Defendant and its agents were aware of the hostile work environment harassment and the change of Plaintiff's terms and conditions of employment.

130. Defendant and its agents failed to properly investigate Plaintiff's many complaints.

131. Defendant and its agents failed to take swift remedial action.

132. Defendant and its agents did not promote or transfer Plaintiff because of his age.

133. Defendant maintained age-based employment policies with the intent to disqualified individuals, including Plaintiff, on the basis of age; these policies and practices arbitrarily and summarily denied Plaintiff employment opportunities because of his age.

134. Defendant and its agents, by their conduct, failed in its affirmative duty under ADEA by its failure to maintain a work environment free from discriminatory insult, intimidation, or abuse directed at older workers.

135. Plaintiff also engaged in protected conduct, opposed unlawful treatment, and exercised his rights under the ADEA.

136. Plaintiff was retaliated against by Defendant and its agents as a direct and proximate result of his protected acts.

137. Defendant and its agents' conduct in harassing, discriminating against, and retaliating against Plaintiff's after he conducted protected acts in reporting the same was motivated solely by an intent to discriminate against Plaintiff on the basis of his age and retaliate against him for his protected complaints.

138. Defendant and its agents' discriminatory and retaliatory conduct, policies and practices were willful, intentional, motivated by animus, impermissible and unlawful considerations and violates, *inter alia*, the ADEA.

139. Plaintiff was damaged as a proximate result of Defendant and its agents' intentional conduct.

140. Defendant and its agents' acts and omissions constitute gross negligence, recklessness, and willful or wanton misconduct and punitive damages are warranted.

141. Defendant is responsible for the unlawful acts and omissions of its agents under Respondeat Superior.

**COUNT TWO**
*AGE DISCRIMINATION - HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
*AGE DISCRIMINIATION - FAILURE TO TRANSFER/PROMOTE*
*AGE DISCRIMINATION – RETALIATION*
*Violation of Mass. Gen. L. ch. 151B et. seq.*

142. ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

143. Plaintiff is a person over forty (40) years old and is protected from age-based harassment and discrimination under Chapter 151B.

144. Because of his age, Defendant and its agents treated Plaintiff differently than employees under 40, subjected him to disparate discriminatory treatment and harassment because of his age.

145. Such treatment and harassment was so severe and pervasive it changed the terms and conditions of employment as described in the above Paragraphs.

146. Defendant and its agents were aware of the hostile work environment harassment and the change of Plaintiff's terms and conditions of employment.

147. Defendant and its agents failed to properly investigate Plaintiff's many complaints.

148. Defendant and its agents failed to take swift remedial action.

149. Defendant and its agents did not promote or transfer Plaintiff because of his age.

150. Defendant maintained age-based employment policies with the intent to disqualified individuals, including Plaintiff, on the basis of age; these policies and practices arbitrarily and summarily denied Plaintiff employment opportunities because of his age.

151. Defendant and its agents, by their conduct, failed in its affirmative duty under 151B by its failure to maintain a work environment free from discriminatory insult, intimidation, or abuse directed at older workers.

152. Plaintiff also engaged in protected conduct, opposed unlawful treatment, and exercised his rights under the 151B.

153. Plaintiff was retaliated against by Defendant and its agents as a direct and proximate result of his protected acts.

154. Defendant and its agents' conduct in harassing, discriminating against, and retaliating against Plaintiff's after he conducted protected acts in reporting the same was motivated solely by an

intent to discriminate against Plaintiff on the basis of his age and retaliate against him for his protected complaints.

155. Defendant and its agents' discriminatory and retaliatory conduct, policies and practices were willful, intentional, motivated by animus, impermissible and unlawful considerations and violates, *inter alia*, the 151B.

156. Plaintiff was damaged as a proximate result of Defendant and its agents' intentional conduct.

157. Defendant and its agents' acts and omissions constitute gross negligence, recklessness, and willful or wanton misconduct and punitive damages are warranted.

158. Defendant is responsible for the unlawful acts and omissions of its agents under Respondeat Superior.

## COUNT THREE
*SEXUAL ORIENTATION DISCRIMINATION - HOSTILE WORK ENVIRONMENT / DISCRIMINATORY TERMS AND CONDITIONS*
*SEXUAL ORIENTATION DISCRIMINIATION - FAILURE TO PROMOTE/TRANSFER*
*SEXUAL ORIENTATION DISCRIMINATION – RETALIATION*
**Violation of Mass. Gen. L. ch. 151B et. seq.**

159. ALL Paragraphs are hereby incorporated by reference in their entirety as if fully stated herein.

160. Plaintiff is a member of a protected class because he is a gay male and is protected from sexual orientation-based harassment and discrimination under Chapter 151B.

161. Because of his age, Defendant and its agents treated Plaintiff differently than employees because of Plaintiff's sexual orientation, subjected him to disparate discriminatory treatment, and harassment because of his sexual orientation.

162. Such treatment and harassment was so severe and pervasive it changed the terms and conditions of employment as described in the above Paragraphs.

163. Defendant and its agents were aware of the hostile work environment harassment and the change of Plaintiff's terms and conditions of employment.

164. Defendant and its agents failed to properly investigate Plaintiff's many complaints.

165. Defendant and its agents failed to take swift remedial action.

166. Defendant and its agents did not promote or transfer Plaintiff because of his sexual orientation.

167. Defendant maintained sexual orientation -based employment policies with the intent to disqualified individuals, including Plaintiff, on the basis of sexual orientation; these policies and practices arbitrarily and summarily denied Plaintiff employment opportunities because of his sexual orientation.

168. Defendant and its agents, by their conduct, failed in its affirmative duty under 151B by its failure to maintain a work environment free from discriminatory insult, intimidation, or abuse directed at workers because of their sexual orientation.

169. Plaintiff also engaged in protected conduct, opposed unlawful treatment, and exercised his rights under the 151B.

170. Plaintiff was retaliated against by Defendant and its agents as a direct and proximate result of his protected acts.

171. Defendant and its agents' conduct in harassing, discriminating against, and retaliating against Plaintiff's after he conducted protected acts in reporting the same was motivated solely by an intent to discriminate against Plaintiff on the basis of his sexual orientation and retaliate against him for his protected complaints.

172. Defendant and its agents' discriminatory and retaliatory conduct, policies and practices were willful, intentional, motivated by animus, impermissible and unlawful considerations and violates, *inter alia*, the 151B.

173. Plaintiff was damaged as a proximate result of Defendant and its agents' intentional conduct.

174. Defendant and its agents' acts and omissions constitute gross negligence, recklessness, and willful or wanton misconduct and punitive damages are warranted.

175. Defendant is responsible for the unlawful acts and omissions of its agents under Respondeat Superior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a. order judgement for Plaintiff against Defendants on all Counts of the Complaint and declare that the policies, customs, practices, and conduct set forth of in this Complaint are unlawful;

b. order, for all applicable Counts, that Defendants make Plaintiff whole by awarding appropriate lost pay due to work-related stress medical leave with interest, front pay for lack of transfer/promotions, compensation for all other lost economic harm, and compensation for loss of other relevant entitlements and emoluments;

c. order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate Plaintiff for his emotional pain and suffering, damage to his reputation, loss of standing in the community, and loss of enjoyment of life;

d. order, for all applicable Counts, that the Defendants pay Plaintiff's reasonable attorney's fees, costs, and expenses incurred in pursuing this action to the full extent permitted by law resulting from this action;

e. order, for the ADEA and/or all applicable Counts, that the Defendants pay liquidated damages or the amount equal to three times the actual damages for knowing violation of the ADEA;

f. order, for all applicable Counts, that the Defendants pay punitive or exemplary damages, as appropriate to punish Defendants to the full extent permitted by law;

g. order, for all applicable Counts and if applicable under law, that Defendants pay post-judgment interest;

h. order, for all applicable Counts and if applicable under law, that Defendants pay pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued;

i. retain jurisdiction of this action to ensure full compliance; and

j. grant such other relief to Plaintiff as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

*PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

March 10, 2018

Respectfully Submitted,
**Plaintiff, Jeffrey Deschenes,**
By his attorney,

/s/ Paige Munro-Delotto

Paige Munro-Delotto, Ph.D., Esq.
BBO #: 690605
Munro-Delotto Law, LLC
400 Westminster Street, Ste. 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com